## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| **PROEF LLC** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Case No.  5:25-cv-00002** |
| | § | |
| **MOUNT VERNON FIRE INSURANCE** | § | **JURY TRIAL DEMANDED** |
| **COMPANY** | § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Proef LLC ("Plaintiff" and/or "Proef") complains of defendant Mount Vernon Fire Insurance Company ("Defendant" and/or "Mount Vernon"), and would respectfully show as follows:

### I.
### PARTIES AND PROCESS SERVICE

1.      Plaintiff is a domestic limited liability company in the State of Texas with its principal place of business in the State of Texas.

2.      Upon information and belief, Defendant is a foreign surplus lines insurance company with its principal place of business at 1190 Devon Park Road in Wayne, Pennsylvania. Defendant may be served through its designated agent—the Texas Commissioner of Insurance—located at 1601 Congress Avenue, Austin, TX 78701.  Per the Policy, Defendant may also be served at General Counsel of Mount Vernon Fire Insurance Company, 1190 Devon Park Drive, Wayne, Pennsylvania 19087.  Plaintiff requests the Clerk issue a summons, which will be served on Defendant concurrently with a copy of this complaint.

### II.
### JURISDICTION AND VENUE

3.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because this action concerns real property located in Bowie County, Texas, and all or a substantial part of the events giving rise to the claim described herein occurred in Bowie County, Texas. The insurance policy at issue and of which Plaintiff is a beneficiary was to be performed in Bowie County, Texas and the losses under the policy (including payments to be made to Plaintiff under the policy) were required to be made in Bowie County, Texas.  Further, investigation, including communications to and from Defendant and Plaintiff (including telephone calls, mailings, and other communications to Plaintiff) occurred in Bowie County, Texas.

### III.
### NOTICE AND CONDITIONS PRECEDENT

5.    Pre-suit notice was given on November 4, 2024, pursuant to TEX. INS. CODE § 542A.003(a).

6.    All other conditions precedent to suit or payment under the insurance policy at issue in this lawsuit have been satisfied by Plaintiff, excused, or waived by Defendant, or Plaintiff is excused from performance due to Defendant's prior breach of the policy. Defendant has not been prejudiced by Plaintiff's actions, inactions, or delays, if any. Any failures by Plaintiff to satisfy any conditions precedent have not prejudiced the Defendant in this case.

### IV.
### FACTUAL BACKGROUND AND THE ACTS AND OMISSIONS GIVING RISE TO
### PLAINTIFF'S CLAIMS

**A.  <u>The Property and The Policy.</u>**

7.      This is a claim for property insurance proceeds for damages caused by direct physical loss from hailstorms which passed over the building. Upon information and belief, hail reportedly pounded the area with up to hen egg sized hail measuring at or greater than 2 inches on or about February 11, 2024 (the "Hailstorm").

8.      Proef owns certain real commercial property with improvements located at 3807 University Dr., Tyler, TX 75701 ("the Property"), which on the date of loss was insured under insurance policy No. CF 2570123 issued by Defendant (the "Policy"). The Property was built in 2014 and is currently leased and operating as a popular restaurant establishment located across from the University of Texas-Tyler.



9.      Upon information and belief, Mount Vernon initially issued a policy of insurance to Proef in 2022. It is customary for insurers to perform underwriting inspections to determine the condition and insurability of commercial properties.  Upon information and belief, Mount Vernon performed such an underwriting inspection to determine the condition and insurability of the Property creating a Risk Management Underwriting Report.  Underwriting inspections include an assessment of the condition of the property, including the roofs.  But regardless of whether an inspection was actually conducted prior to issuing Proef the very first policy covering the Property, Defendant certainly

had the opportunity to conduct an inspection at any time and decline coverage if it had any concerns with regard to the condition of the roof.

10.    Although the Property was constructed approx. 10 years ago, only one claim for building damage was made around 2016 when a fallen tree damaged a small section of the roof.  Proef's insurer at that time paid around $50,000 towards the claim, and Proef used the entirety of the proceeds in combination with its own funds to restore the damaged portions of the roof to its pre-loss condition.

### B.  <u>Wind and Hail Damage During the Hailstorm.</u>

11.    The Hailstorm struck Tyler, Texas on or about February 11, 2024.  An impact report created by HailTrace shows the duration and magnitude of the storm as indicated below:

**MOST RECENT SEVERE WEATHER EVENTS**

| DATE | EVENT TYPE | DURATION | MAGNITUDE | ALGORITHM MAGNITUDE | IMPACT RATING |
|------|-----------|----------|-----------|---------------------|---------------|
| 2024-06-03 | WIND | 6 min | 70 mph | - | 0/100 |
| 2024-05-28 | WIND | - | 73 mph | - | 0/100 |
| 2024-02-11 | HAIL | 5 min | 2.5 in | 1.5 in | 55/100 |
| 2023-06-15 | WIND | 7 min | 73 mph | - | 0/100 |

Additional weather information confirming the diameter of the 2 inch hail is below:

**2.00 Inch Hail Near Tyler, Texas On 02/11/2024**



This hen egg sized hail was reported at 6:53:00 AM CST on 02/11/2024 about 4 miles from the center of Tyler, Texas. Tyler has a population of 96900 and has 35337 housing units in the area. The exact location that this hail report originated from was 32.31, -95.34. The area around Tyler has had 25 hail storm reports within 10 miles in the last 3 years.
**Hail Report Details**
**HAIL SIZE**
2.00"

**CITY**
Tyler
**LOCATION**
2 Sw Tyler
**STATE**
Texas
**Coordinates**
32.31, -95.34 [https://www.stormersite.com/showreport/479513]

The location coordinates exhibiting documented hen egg size hail are in close proximity to the Property.   The coordinates for the insured's location are 32.31, -95.25, as noted on the Storm Impact report.

12.     In short, a large hail storm with approx. 2.0" hail occurred in Tyler, Texas on February 11, 2024.  Hailstones ranging from the size of ping pong balls to hen eggs fell from the skies at a speed of 25-40 miles per hour.  Photos and videos of the intensive speed and massive size hail impacting the Tyler, TX area were recorded by the local news media and are available for viewing by clicking the link below:

   https://www.ketk.com/news/local-news/watch-east-texas-hit-by-hail-during-severe-weather/

13.     The roofing system is comprised of Thermoplastic Olefin (TPO) and corrugated metal panels. As a result of the Hailstorm, the Property sustained significant direct physical loss to the roofing system on the building which compromised the structural integrity of the roofing materials and created pathways for rainwater infiltration through the damaged roof.  Stated differently, the Property sustained significant visible indentations to the roofing system compromising the integrity of the structure from future weather-related events. Indeed, the roofing system was damaged so extensively that it can no longer perform its intended function and must now be replaced. The damages sustained by Plaintiff are covered under the Policy. Prior to the Hailstorm, the roofing system was performing as intended.

   **C.  <u>The Claim and Mount Vernon's Failure to Properly Handle the Claim.</u>**

14.    Republic Icehouse, the Property's longtime tenant, began to notice leaks in the men's bathroom and the kitchen area in late April 2024.  Republic's primary representative, Adam Morris, had never noticed or observed any evidence of leaking prior to the Hailstorm.









15.     As a result of the new interior leaks, in April 2024 Plaintiff entered into a contractual agreement with Stonewater Roofing – a reputable family-owned roofing company in the area – to identify the extent of hail damage, if any.   Stonewater performed an inspection of the roof and immediately noticed recent splatter marks and numerous dents that had impacted the metal roofing panels, all of which was documented across dozens of photos.   As a result of Stonewater's investigation and assessment, Stonewater prepared an estimate of costs for roof replacement in the amount of $377,132.00.

16.     Once Plaintiff realized the connection between the leaks and the extensive recent hail damage on the roof documented by Stonewater, Proef made a claim for damages caused by the Hailstorm and requested payment for damages to the Property covered by the Policy on May 8, 2024 (the "Claim"). Despite the damage suffered by Plaintiff, Proef felt fortunate to be protected by the insurance coverage procured from Defendant to protect his investment from catastrophes such as the Hailstorm.

17.     A third party adjusting company, United States Liability Insurance, was assigned to adjust Plaintiff's damages covered by the Policy of insurance.  Glenn Knies ("Knies"), the adjuster for United States Liability Insurance ("USLI"), immediately retained an engineering firm, QED Solutions, Inc., to investigate the matter.  These third-parties were retained to assist Defendant in evaluating the Claim.  At all material times, USLI, Prodigy Assurance Adjusters and QED Solutions, Inc. were acting as Defendant's agents in the course and scope of their agency with Defendant.  Accordingly, Mount Vernon is liable for their acts and omissions.  Upon information and belief, Mount Vernon has retained QED Solutions on countless occasions in the past for engineering inspections—a calculated effort to support its routine coverage position that any hail damages observed on insured properties are somehow "cosmetic" in nature.  The immediate retention of QED Solutions was an obvious effort to bolster its pre-determined position that all the damages were cosmetic, and that a "bona fide" dispute allegedly existed during the claims adjusting process to try and absolve Defendant from common law bad faith.  Plaintiff fully expects discovery to reflect that the vast majority of QED's revenue comes from insurance carriers.

18.     On May 23, 2024, QED performed an incomplete and sub-par engineering inspection. After a report was issued, on June 12, 2024, Knies immediately denied the claim based on QED's pretextual cut and paste findings in its engineering report, which contended that the spatter marks

and indentations observed on both the TPO roof membrane and standing seam metal panels were not functional damages but were "cosmetic in nature":

> "We have completed our investigation and reviewed your policy. The investigation found no functional damage attributable to hail observed on the thermoplastic poly-olefin (TPO) or standing seam metal panel roof coverings. One section of TPO membrane was cut and laid back to inspect the underlying roof components. No fractures or bruising were observed on the backside of the TPO roof membrane. Although 1" diameter indentations were observed in the insulation, no fractures or tears were present. The spatter marks on the TPO membrane and indentations on the insulation were cosmetic in nature and did not affect the function of the roofing components or reduce the R-value of the insulation. Widespread circular dents/spatter marks were observed on the rooftop appurtenances and ancillary features (including metal cap flashings, metal roof vents, metal satellite dish, and condenser units/coils). These dents and function of the roofing components. The spatter marks and indentations observed throughout the property roofing and cladding components were attributable to hail from multiple weather events over multiple years and including the hail event on or about February 11, 2024. The observed condition of the roof covering was not attributable to wind. There were no missing/displaced TPO membrane layers or metal panels.
>
> Regarding the identified hail damage to the HVAC fins, which is covered, the estimated replacement cost (RC) amount is $1,520.81. Depreciation was applied in the amount of $8.98, yielding an actual cash value (ACV) loss in the amount of $1,511.83. The policy carries a special $12,000.00 deductible for damage caused wind and/or hail, thus there is no payable loss to consider.
>
> As explained in more detail below, the Policy does not provide coverage for the cosmetic damage to the roof. Therefore, the Company respectfully denies coverage for that aspect of your claim."

19.     Although the Defendant and its agents are required by Texas law and the Policy to conduct a reasonable and thorough investigation of the Claim, they failed to do so. Rather than accept coverage for the obvious damage caused by the Hailstorm, Mount Vernon pinned the entirety of its nonpayment of the Claim on cosmetic damage only and improperly concluded that Proef's roofing damages were not a "covered cause of loss" under the Policy.

> ***
> "B. The following applies with respect to loss or damage by wind and/or hail to a building or

structure identified in the Schedule as being
subject to this Paragraph B.:
We will not pay for cosmetic damage to roof
surfacing caused by wind and/or hail. For the
purpose of this endorsement, cosmetic damage
means that the wind and/or hail caused marring,
pitting or other superficial damage that altered the
appearance of the roof surfacing, but such
damage does not prevent the roof from continuing
to function as a barrier to entrance of the elements
to the same extent as it did before the cosmetic
damage occurred.

Cosmetic abrasions to the roofs will not impede performance or shorten the
service life of the roof and therefore does not warrant their replacement. Since there
was no Covered Cause of Loss that caused the observed condition of the roofs,
there is no coverage for this aspect of the loss.

For the reasons stated above, the Policy does not provide coverage for a
portion of this matter. This determination is based upon all information available to
me currently. If you have additional information or legal authority that you believe
may affect the Company's position regarding coverage for this claim, or you obtain
such information or authority in the future, I would be happy to review the same at
any time."

20.     After the pre-textual denial, Plaintiff was forced to adjust its own loss. Even though

Plaintiff had no obligation to present his own competing estimate or to perform its own

investigation, approx. 45 days later Proof retained an independent engineering inspection, BR

Architects, Inc. ("BRAE"), in an effort to identify the scope and cause of the damages.  BRAE's

primary goal was to review the existing conditions of the roof systems to identify any potential

future structural and architectural issues, as well as to suggest any necessary repairs.  Russell

Bradford with BRAE conducted an onsite inspection of the roofing system's "as built" conditions

to determine the roof's adherence to common engineering standards.

21.     BRAE's detailed report of its findings included measurements of hailstone impacts ranging

from .75" to 2.5" to the TPO and metal panel roofing.  The top layer of TPO roofing showed visual

evidence of hail damage, resulting in visible indentations, punctures and tears.  This physical

damage compromised the integrity of the TPO membrane and created pathways for water to enter into the interior of the building.  The metal roofing sheets also showed visual evidence of hail impact as collateral damage.  The structural roof damages resulted in percolation of water and evidenced further moisture retention of the insulation causing the insulation to become saturated, compromising its effectiveness and potentially fostering mold growth.  Of note, even the CoreLogic weather data in QED's report reflected the severity of the Hailstorm documented in BRAE's weather data (and the other large recent hail events during the time Proef has carried insurance with Mount Vernon):

## Storm Events

|  | | Estimated Maximum Hail Size | |
| --- | --- | --- | --- |
| Date | At Location | Within 1 mi | Within 3 mi |
| 02/11/2024 | 1.7 in | 1.9 in | 2 in |
| 09/03/2023 | <0.75 in | <0.75 in | 0.8 in |
| 06/13/2023 | 0.8 in | 0.9 in | 1.3 in |
| 04/26/2023 | <0.75 in | 0.8 in | 1 in |
| 03/31/2023 | <0.75 in | 0.8 in | 0.8 in |
| 03/16/2023 | 0.8 in | 1 in | 1 in |
| 03/14/2022 | <0.75 in | 0.75 in | 0.8 in |

22.     BRAE's report also refuted several of QED's assessments that the observed damages were mere "cosmetic" alterations.  QED's summary was crafted solely to support Defendant's claim of cosmetic damage compared to BRAE's analysis of hail-induced damages affecting the functionality of the roofing system.  BRAE emphasized the need for a comprehensive review and transparent assessment process to accurately determine the extent of hail damage to the roof's membrane, and ultimately recommended the replacement of the entire TPO roof with a more resilient and durable material given the hail damage caused significant punctures and tears in the

TPO membrane and joints, resulting in the roof not functioning the same as it did prior to the Hailstorm.

23.    On September 5, 2024, David King emailed BRAE's report to the desk adjuster on Proef's behalf:

> **From:** David King dking@prim.com
> **Date:** September 5, 2024 at 3:00:35 PM GMT+2
> **To:** "Glenn Knies, SCLA" <gknies@usli.com>
> **Cc:** Beth Gauldin <bgauldin@gotapco.com>, Cody Clark <cclark@prodigyassurance.com>, David King <dking@prim.com>, Adam Morris <republicicehouse@yahoo.com>
> **Subject: Re: Claim : 0-39331 - Proef LLC, (C)**
>
> "As I previously said when we received your decline to cover we did not agree with your assessment.  You said we could certainly investigate ourselves and that is exactly what we have done.  We carry insurance for this kind of an event and we feel it should be covered.
>
> Attached is the engineer report that has been done through a neutral party.
>
> The report basically recommends a full roof replacement, so at this time, I ask that you review this exhaustive report herein and respond favorably to a new roof replacement.  I am also copying the insurance adjuster on this email thread letting them know that the engineer report that y'all requested is completed and that the recommendation is a full roof replacement.  The adjuster listed is Cody Clark, his phone number is (954)778-1721.
>
> Would appreciate your prompt attention to this matter because if this roof begins to leak and does any damages inside the building I will expect that to be handled also.  Let's hope that doesn't happen.
>
> Regards,
> David King

24.    Thereafter, a breakdown in communication continued between Knies and Plaintiff's representatives, as Mr. King declined Defendant's effort to have the engineers jointly reinspect the Property (at Proef's expense) as an obvious stalling technique, particular since QED had been provided with BRAE's written conclusions:

**From:** David King <dking@prim.com>
**Date:** September 26, 2024 at 1:02:18 PM CDT
**To:** Glenn Knies <gknies@usli.com>
**Cc:** Waseem Ansari <wansari@qedgs.com>, Beth Gauldin <bgauldin@gotapco.com>, Cody Clark <cclark@prodigyassurance.com>, Adam Morris <republicicehouse@yahoo.com>, Adam Morris <republicicehouse@yahoo.com>, rbrowne@stonewaterroofing.com

**Subject: Claim : 0-39331 - Proef LLC, (C)  David King 469-265-6661**

 "Glenn I am growing more and more concerned about what appears to be a lack of concern/attention and stalling techniques to cover the damage to my building which I have insured with your organization.

- First, let me provide you with a full estimate for all repairs on the building.
- I do not understand why and therefore I decline to allow you to bring out yet another engineer to argue with our independent engineer. In our (both mine, the independent engineer hired, and the roofing company) humble opinion, this seems like a delay tactic. Moreover, you have already had a licensed engineer visit the property and he has provided his findings. We had no choice but to engage our own independent engineer and he has provided his findings. Doing so again seems redundant and introduces a definitive level of bias to the process. Time is of the essence as we have hail damage and leaks at our location.
- Please honor the attached estimate from our selected contractor.
- We will give you 10 business days to honor it.
- In the event that you opt not to honor our roof replacement we will have no other option but to have an attorney handle this matter hence forth."

Regards,

David King
Republic Icehouse

25.     What's more, Mr. King was on the roof prior to the Hailstorm around 2022. Having also

been on the roof following the Hailstorm, he definitely observed new evidence of hail markings

that were absent before.

26.     Unfortunately, Defendant never amended or provided any basis supporting its initial

decision in denying the claim. Plaintiff still has no clue how the significant damage to the Property

would not be covered under the terms of the Policy.  Adding insult to injury, Defendant refused to

renew the policy in September 2024 because of the pending hailstorm claim and Plaintiff's filing for damages covered under the Policy. Plaintiff scurried to find new coverage during a time of higher rates, but has been unable to do so. While not a private cause of action, Defendant's conduct violates the consumer Bill of Rights as adopted by the Texas Administrative Code.

27.     Plaintiff presented a claim under its Policy for hailstorm damages. But Plaintiff took it another significant step, providing detailed breakdowns of bids, estimates and proposals their retained experts prepared for Defendant's benefit. It was Defendant's responsibility, not Plaintiff's, to conduct a reasonable and thorough investigation of the Claim to determine the specific cause of the loss and the amount of loss. Yet, Defendant wholly failed to do so.

28.     Defendant has delayed resolution of the Claim under Texas law and has misrepresented the applicable scope of damages in the sole estimate they have provided. Moreover, Defendant conducted a biased, substandard investigation of the Claim, and grossly undervalued the full amount of Plaintiff's damages. Defendant's conduct is part of a pattern and practice of illegal, antibusiness conduct directed toward Texans. Unfortunately, Defendant has a history of conducting arbitrary, outcome-oriented investigations intended to deny valid claims. Mount Vernon has intentionally avoided regulation by the Texas Department of Insurance by operating as a grey market, non-admitted foreign surplus lines carrier. Indeed, Defendant appears to be a subsidiary of a major insurance conglomerate. Because Defendant has chosen to operate as a grey market insurer, they appear to have no employees and amount simply to an investment fund for foreign interests, profiteering off of Texas businesses. Having no actual employees in Texas, Defendant outsources all claims handling duties to third party administrators or adjusting companies, but give them virtually no authority to promptly pay claims. Instead, they have complex bonus and incentive plans that reward underpayment and denial.

29.    Defendant also failed to live up to its marketing promises and representations to the

consumer. According to USLI's website, Defendant is owned or affiliated with United States

Liability Insurance:

> "USLI is a proud member of Berkshire Hathaway.  Our group consists of five
> insurance companies:  United States Liability Insurance Company, Mount Vernon
> Fire, Mount Vernon Specialty Insurance Company, Radnor Specialty Insurance
> Company and U.S. Underwriters Insurance Company, all of which are rated A++,
> the highest rating available to any insurance entity by AM Best, the premier analyst
> of insurance companies.  Our companies give us the ability to offer admitted or
> non-admitted insurance policies in all 50 states and the District of Columbia.  USLI
> aspires to be the very best insurance company for underwriting insurance for small
> businesses along with a select group of specialty products.  We are committed to
> making a difference to our customers through well-designed products delivered
> with unparalleled speed, service and support."[1]

30.    Mount Vernon and its agents' improper handling of the Claim subjects Mount Vernon to

liability pursuant to Tex. Ins. Code § 541.001, *et seq.* and Tex. Ins. Code § 542.051, *et seq.*

Moreover, Mount Vernon violated Tex. Ins. Code § 541.060(a) and engaged in Unfair Settlement

Practices by:

> a)    **Misrepresenting to Plaintiff material facts or policy provisions relating to the
> coverage at issue**. Mount Vernon represented to Plaintiff that the covered damage to the
> Property was less than the amount estimated, when the actual cost for damaged Property is
> over $377,132.00.  Mount Vernon's adjusters also misrepresented that the cosmetic damage
> exclusion applied—relying on the same exclusion that has been repeatedly used by Mount
> Vernon over the last five years in a specific effort to deny claims.  Rather than fully
> compensate Plaintiff for its losses, Defendant failed to adequately assess damages, and as
> a result grossly undervalued the amount of Plaintiff's covered losses. By denying the
> Claim, Defendant represented that much of the damage caused to the Property was either
> not covered by the Policy or reflects a deliberate disregard for the obvious damages.
>
> b)    **Failing to attempt in good faith to effectuate a prompt, fair, and equitable
> settlement of the Claim, even though Defendant's liability under the Policy was
> reasonably clear**. Mount Vernon acted in bad faith when it ignored the obvious substantial
> amount of damages to the Property and failed to adjust the Claim, relying on the "cosmetic"
> exclusion. Despite the multiple efforts of Plaintiff's retained expert, Mount Vernon held its
> ground and refused to give any credence or consideration to the estimates and analysis
> presented by its insured. In addition, Plaintiff has dutifully paid its premiums to Mount Vernon

---

[1] https://www.usli.com/about-us/

for over three (3) years, and Mount Vernon had numerous opportunities to inspect and reevaluate Plaintiff's coverages on the building structure year-after-year (choosing to underwrite this risk and annually cash Plaintiff's annual premium checks). Finally, Mount Vernon rejected with no explanation all of the disinterested third-party reports, bids, and findings procured by Proef's experts (in its significant efforts to perform Defendant's contractual obligations for them), siding with its financially biased engineering firm that repeatedly prepared reports for Defendant noting that damage is "cosmetic," rather than functional, to steer covered losses into the standard exclusion.  Such conduct is likely contrary to the written property and casualty claims handling guidelines maintained by Defendant.

c)      **Failing to promptly provide Plaintiff with a reasonable explanation of the basis in the Policy, in relation to the facts or applicable law for Mount Vernon's underpayment of the Claim or offer of a compromise settlement of the Claim.**  Plaintiff is unclear how the significant damage to the Property would not be covered under the terms of the Policy.  In addition, Mount Vernon completely ignored the report and findings of Proef's retained engineer, BRAE.

d)      **Refusing to pay Plaintiff's Claim without conducting a reasonable investigation with respect to the Claim**. Rather than fully compensate Plaintiff for its losses, Mount Vernon has failed to conduct a reasonable and thorough investigation of the Claim. Moreover, Mount Vernon's reliance on its position that the significant damage were "cosmetic abrasions" is patently unreasonable based on Plaintiff's expert reports. Mount Vernon's investigation was further unreasonable because it failed to determine the full amount of Plaintiff's damages, even though the damages were obvious and the true amount of cost to repair the damages was readily ascertainable. Had Mount Vernon conducted a reasonable and thorough investigation of the Claim, it would have determined the actual amount of Plaintiff's covered losses and could have made a timely decision on the Claim. Moreover, Mount Vernon failed to use appropriate experts to thoroughly investigate the Claim – the expert that was retained was clearly biased in favor of Defendant based on their lengthy financial relationship with insurance carriers in general.  Had Mount Vernon retained qualified, disinterested experts, they would have concluded that the substantial covered losses to the Property were covered under the Policy.

e)      **Violating  the Consumer Bill of Rights as Adopted by the Texas Administrative Code.**  Mount Vernon refused to renew the policy in September 2024 because of the pending hailstorm claim and Plaintiff's filing for damages covered under the policy.  Plaintiff scurried to attempt to find new coverage during a time of higher rates. This specifically violates the consumer Bill of Rights as adopted by the Texas Administrative Code. "Limits on using claims history to increase premium.  Your insurance company cannot increase your premium based on claims for damage from natural causes, including weather-related damage; or claims that are filed but not paid or payable under your policy."  28 TEX. ADMIN. CODE § 5.9971(b).  A carrier cannot cancel a policy unless there is an increase in the risk covered by the policy, which could not have possibly been the case given Defendant's position that all the damage was minimal or cosmetic

31.     Mount Vernon took advantage of Plaintiff's lack of knowledge, ability, experience or capacity to a grossly unfair degree and to Plaintiff's detriment. Mount Vernon's acts also resulted in a gross disparity between the value received and the consideration paid in a transaction involving the transfer of consideration. As a result of Mount Vernon's violations, Plaintiff suffered actual damages. In addition, Mount Vernon committed the above acts knowingly and/or intentionally, entitling Plaintiff to three times its damages for economic relief.

32.     Further, Mount Vernon violated the prompt payment of claims provisions of TEX. INS. CODE § 542.051, *et seq.* by delaying payment of the Claim following Mount Vernon's receipt of all items, statements, and forms reasonably requested and required, longer than the amount of time provided by TEX. INS. CODE § 542.058. In addition, under the terms of the policy, Mount Vernon had no more than 45 days to reach a decision on the Claim. But obviously more than 75 days passed from the time Mount Vernon was in receipt of all items, statements, and forms reasonably requested and required, which is longer than the time limits established by TEX. INS. CODE §§ 542.058 and 542.059. Accordingly, Mount Vernon is liable to Plaintiff or damages pursuant to TEX. INS. CODE § 542.051, *et seq.*

33.     Plaintiff has fulfilled all duties required of him pursuant to the terms of the Policy.

34.     In summary, Mount Vernon failed to comply with the Policy, the Texas Insurance Code, and Texas Law in handling the Claim, and has failed to pay all amounts due and owing under the Policy for the Claim. Mount Vernon and its representatives failed to perform a thorough investigation of Plaintiff's claim, failed to employ appropriate or qualified consultants to evaluate the damages, delayed resolution of the claim under Texas law, and misrepresented applicable scopes of damages and exclusions, as well as the terms of the Policy. Adjusters employed by Mount Vernon violated the law through their own acts and omissions in the handling of the Claim. Because of these

violations of law and wrongful conduct, Plaintiff has sustained and continues to sustain significant damages, including but not limited to property damage, diminution of property value, attorney's fees, financial harm, and other consequential damages. Accordingly, Plaintiff requests payment for damages to the Property pursuant to the terms and conditions of the Policy. Plaintiff also requests payment for its attorneys' fees to date.

### D.   Independent Injuries and Benefits-Lost from Mount Vernon's Conduct.

35.     Aside from its breach of contract, Mount Vernon's delay and other unconscionable actions have potentially led to additional uncovered losses that either qualify as an "independent injury" or result from Mount Vernon's actions, and thus are still owed under the "Benefits-Lost Rule" grounded in Texas common law. As merely one example, Plaintiff's cost of entering into a contract with Stonewater and incurring engineering costs would ordinarily not be covered under the Policy but was necessitated by Defendant's conduct outlined herein. Because Defendant's statutory violations noted above have prejudiced their insured, Defendant is also estopped from denying any benefits that would otherwise be payable under the Policy as if the risk had been covered. Should Defendant subsequently deny *any* portion of the loss based on limitations within the Policy (to be clear, which Plaintiff does not believe will legally apply, given the timing of the adjustment of this loss and underpayment of this Claim, both of which prevented Plaintiff from timely completing repairs), Plaintiff may still recover any damages sustained due to Defendant's actions to date even if the Policy does not cover such losses (*i.e.*, entitlement to replacement cost benefits).

### E.   Mount Vernon effectively ignores Plaintiff's efforts to resolve the Claim amicably prior to litigation.

36.     On June 1, 2017, Governor Abbot signed House Bill 1774 into law as Section 542A of the Texas Insurance Code.  This new law was sponsored by approximately sixty state representatives and senators and contains important consumer protections against a variety of unscrupulous

practices. Section 542A.003 in particular requires detailed, comprehensive pre-suit notice that is intended to make the claims and litigation processes more transparent and potentially even avoid unnecessary lawsuits. Upon receiving notice, an insurer has a right to conduct an inspection, and even make an offer to avoid litigation. When utilized properly, Section 542A should assist insureds like Plaintiff to avoid protracted litigation over a clear claim.

37.     In compliance with Section 542A.003, Plaintiff sent a pre-suit notice letter with exhibits on November 4, 2024 (the "Notice Letter"). The Notice Letter provided a 17-page single-spaced comprehensive outline of Plaintiff's claims and damages, and quantified Plaintiff's losses by presenting detailed expert reports and photos on the Property. Even though Plaintiff had no obligation to present its own competing estimate when essentially being forced to adjust its own loss, Stonewater eventually determined through Xactimate—the gold standard to estimate construction scopes used throughout the insurance industry—that the covered replacement cost to properly and permanently repair the covered damages to the Property was approx. $377,132.00 minimum. The Notice Letter attached Stonewater's estimate, and BR's expert reports. Plaintiff also offered to take a substantial discount of the total covered damages under the Policy to which it was entitled to avoid protracted litigation.

38.     Not only did Defendant fail to provide any of the responsive documents requested in writing on at least two occasions by the undersigned counsel—Defendant continues to hide the most significant responsive documents which Defendant allegedly relied on to adjust this Claim. Below is an excerpt from the Notice Letter:

## VI.    Request for Claim-Related Documents and Underwriting Reports/Materials

We would respectfully request that Mount Vernon produce its complete claim file(s) within the next thirty (30) days—as you know, this is routinely produced during the course of any litigation and is highly relevant to my client's claims referenced herein. This should include any estimates, engineering or other consultant reports, and all internal materials that Mount Vernon and its agents and adjusters created or relied upon to process the Claim.

In addition, most insurance companies conduct a thorough underwriting process prior to entering into loss control survey. These reports have material information about the condition of the Property prior to the loss and will reflect how long our client has been insured with Mount Vernon. We request that Mount Vernon produce its underwriting file, including any inspection reports, within the next thirty (30) days. Particularly if Mount Vernon intends to take the position that some of the hail to the Property pre-existed Mount Vernon complete policy period, this information will be extremely important in determining whether such a defense has merit. To the extent you believe Mount Vernon would take a position that this information is proprietary, I would gladly execute a mutually agreeable confidentiality agreement to facilitate the prompt production of this information.

39.    Indeed, Defendant's sole response to the Notice Letter was a self-serving narrative of events prepared by its newly retained counsel, with no consideration of the competing expert reports that Defendant had been provided.  Defendant otherwise refused to reconsider its position reached during its shoddy and biased investigation, compelling Plaintiff to institute this litigation.

## V.
## CAUSES OF ACTION

40.    Plaintiff reincorporates and realleges each allegation in the preceding paragraphs as if fully set forth herein in support of the causes of action below.

41.    Defendant is liable to Plaintiff for breach of contract, as well as intentional violations of the Texas Insurance Code and breach of the common law duty of good faith and fair dealing.

### A.    Breach of Contract.

42.     The Policy is a valid, binding, and enforceable contract between Plaintiff and Defendant. Defendant breached the contract by refusing to perform its obligations under the terms of the Policy and pursuant to Texas law. Defendant's breach proximately caused Plaintiff injuries and damages. All conditions precedent required under the Policy have been performed, excused,

waived, or otherwise satisfied by Plaintiff and Defendant is estopped from raising the issue due to Defendant's prior breach of the insurance contract or, Plaintiff is excused from performance due to Defendant's prior breach of the policy.

34.    Due to Mount Vernon's breach of the contract terms and continual denial of the claim, Plaintiff continues to sustain damages to its Property.

### B.    Noncompliance With Texas Insurance Code: Unfair Settlement Practices.

43.    The conduct, acts, and/or omissions by Defendant constituted Unfair Settlement Practices pursuant to TEX. INS. CODE § 541.060(a). All violations under this article are made actionable by TEX. INS. CODE § 541.151.

44.    Defendant's unfair settlement practice, as described above, of misrepresenting to Plaintiff material facts relating to the coverage at issue, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(1).

45.    Defendant's unfair settlement practice, as described above, of failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claim, even though Defendant's liability under the Policy was reasonably clear, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(2)(A).

46.    Defendant's unfair settlement practice, as described above, of failing to promptly provide Plaintiff with a reasonable explanation of the basis in the Policy, in relation to the facts or applicable law, for its offer of a compromise settlement of the claim, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(3).

47.    Defendant's unfair settlement practice, as described above, of failing within a reasonable time to affirm or deny coverage of the claim to Plaintiff or to submit a reservation of rights to Plaintiff, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(4).

48.    Defendant's unfair settlement practice, as described above, of refusing to pay Plaintiff's Claim without conducting a reasonable investigation, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(7).

49.    Defendant's conduct described above compelled Plaintiff to initiate a lawsuit to recover amounts due under its policy by offering substantially less than the amount ultimately recovered. Defendant refused to even offer more than its own grossly undervalued estimates despite actual damages, which were much greater. This continued failure compelled Plaintiff to file suit. TEX. INS. CODE § 542.003(5).

50.    Defendant misrepresented the Policy under which it affords property coverage to Plaintiff, by making an untrue statement of material fact. TEX. INS. CODE § 541.061(1).

51.    Defendant misrepresented the insurance policy under which it affords property coverage to Plaintiff by failing to state a material fact that is necessary to make other statements made not misleading. TEX. INS. CODE § 541.061(2).

52.    Defendant misrepresented the insurance policy under which it affords property coverage to Plaintiff by making a statement in such manner as to mislead a reasonably prudent person to a false conclusion of material fact and failing to disclose a matter required by law to be disclosed, TEX. INS. CODE § 541.061(3).

53.    Defendant knowingly committed the foregoing acts, with actual knowledge of the falsity, unfairness, or deception of the foregoing acts and practices, in violation of TEX. INS. CODE § 541.002(1).

### C.    Prompt Payment of Claims Violations.

54.    The Claim is a claim under an insurance policy with Defendant of which Plaintiff gave Defendant notice. Defendant is liable for the Claim. Defendant violated the prompt payment of claims provisions of TEX. INS. CODE § 542.051, *et seq.* by:

a)    Failing to acknowledge receipt of the Claim, commence investigation of the Claim, and/or request from Plaintiff all items, statements, and forms that Defendant reasonably believed would be required within the time constraints provided by TEX. INS. CODE § 542.055. Specifically, Defendant failed to commence a proper investigation of the Claim and failed to request the documents and other forms it required to properly adjust Plaintiff's Claim within a reasonable time and manner;

b)    Failing to notify Plaintiff in writing of its acceptance or rejection of the Claim within the applicable time constraints provided by TEX. INS. CODE § 542.056. Defendant failed to provide Plaintiff with a proper explanation of their Claim decision.  Defendant delayed resolution of the Claim without a proper explanation for their delay, and then relied on improper Policy exclusions in the denial of Plaintiff's Claim without a proper explanation for their reasoning behind their denial; and/or by

c)    Delaying payment of the Claim following Defendant's receipt of all items, statements, and forms reasonably requested and required, longer than the amount of time provided by TEX. INS. CODE § 542.058. To date, Defendant has refused to pay the full amount owed under the Policy for the Claim. Defendant continues to delay full resolution of the Claim by refusing to properly adjust Plaintiff's Claim.

55.    Defendant's violations of these prompt payment of claims provisions of the Texas Insurance Code are made actionable by TEX. INS. CODE § 542.060.

### E.  Breach of the Duty of Good Faith and Fair Dealing

56.    The Texas Supreme Court has recognized a "duty on the part of insurers to deal fairly and in good faith with their insureds.  That duty emanates not from the terms of the insurance contract,

but from an obligation imposed in law 'as a result of a special relationship between the parties governed or created by a contract.'" *Viles v. Security Nat. Ins. Co*., 788 SW 2d 566, 567 (Tex. 1990) (citing *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165 (Tex. 1987)). Therefore, an insured can institute a cause of action against its insurer for breach of the duty of good faith and fair dealing.

57.    Defendant and Plaintiff are in a special relationship, created by the insurance contract, giving rise to a duty on the part of Defendant to deal fairly and in good faith with Plaintiff, who is the insured.

58.    Defendant breached its duty of good faith and fair dealing by:

   a)    Failing to provide a reasonable basis for denial or underpayment of the claim; and/or

   b)    Failing to determine whether there was a reasonable basis for denial or delay of the claim. *Arnold*, 725 S.W.2d at 167.

59.    Specifically, Defendant denied Plaintiff's claim, misrepresenting that "the damages were cosmetic." Defendant's misrepresentation constitutes a breach of its duty of good faith and fair dealing. As fully described above, Defendant further breached its duty of good faith and fair dealing by failing to adequately and reasonably investigate and evaluate Plaintiff's Claim, although Defendant knew or should have known by the exercise of reasonable diligence that its liability was reasonably clear.

60.    Defendant systematically and routinely denies or underpays valid claims to the detriment of its policyholders. As set forth above, the wrongful acts and omissions Defendant committed in this case, or similar acts and omissions, occur with such frequency that they constitute a general business practice of Defendant with regard to handling these types of claims.

61.     By virtue of its systematic wrongful denials, Defendant compels its policyholders to seek legal representation and initiate and maintain a suit to recover an amount due under the policy by offering nothing or substantially less than the amount that will be recovered in a suit brought by the insured.

62.     Defendant either failed to adopt or implement reasonable standards for prompt investigation of claims arising under its policies or is deliberately adopting standards calculated to maximize its profit to the detriment of its policyholders. Defendant is knowingly directing its personnel, agents and/or adjusters to undervalue or underpay valid claims.

63.     Defendant knowingly committed the act of denying and/or underpaying claims without a reasonable basis; therefore, Plaintiff is entitled to actual and exemplary damages at law.

## VI.
## DAMAGES

64.     Plaintiff will show that all the aforementioned acts, taken together or singularly, constitute the producing causes of the damages sustained by Plaintiff. Plaintiff is entitled to the actual damages resulting from the Defendant's violations of the law.   These damages include the consequential damages to its economic welfare from the wrongful denial and delay of benefits including loss of use of the Property, in addition to the other actual damages permitted by law.

65.     For breach of contract, Plaintiff is entitled to regain the benefit of Plaintiff's bargain, which is the amount of Plaintiff's Claim to restore the Property to its pre-loss condition, together with reasonable and necessary attorneys' fees.

66.     For noncompliance with the Texas Insurance Code, Unfair Settlement Practices, Plaintiff is entitled to actual damages, which include the loss of the benefits that should have been paid pursuant to the Policy, court costs and attorney's fees. For knowing conduct of the acts complained of, Plaintiff asks for three times Plaintiff's actual damages. TEX. INS. CODE § 541.152.

67.     For noncompliance with Texas' Prompt Payment of Claims Act, Plaintiff is entitled to the amount of Plaintiff's claim, penalty interest per annum (calculated by adding five (5) percent to the current interest rate as determined by the Board of Governors of the Federal Reserve System) of the amount of Plaintiff's claim as damages, together with attorney's fees.  TEX. INS. CODE § 542.060.

68.     For breach of the common law duty of good faith and fair dealing, Plaintiff is entitled to compensatory damages, including all forms of loss resulting from the insurer's breach of duty, such as additional costs, economic hardship, losses due to nonpayment of the amount the insurer owed, and exemplary damages.

69.     For the prosecution and collection of this claim, Plaintiff has been compelled to engage the services of the law firm whose name is subscribed to this pleading. Therefore, Plaintiff is entitled to recover a sum for the reasonable and necessary services of Plaintiff's attorneys in the preparation and trial of this action, including any appeals to the Fifth Circuit and/or the Supreme Court.

## VII.
## ATTORNEYS' FEES

70.     For the prosecution and collection of this claim, Plaintiff has been compelled to engage the services of the law firm whose name is subscribed to this pleading. Therefore, Plaintiff is entitled to recover a sum for the reasonable and necessary services of Plaintiff's attorneys in the preparation and trial of this action, including any appeals to the Fifth Circuit and/or the Supreme Court.

71.     Plaintiff is entitled to reasonable and necessary attorney's fees pursuant to Texas Civil Practice and Remedies Code Sections 38.001-38.003 because it is represented by an attorney, presented the claim to Defendant, and Defendant did not tender the just amount owed before the expiration of the 30th day after the claim was presented.

72.     Plaintiff further prays that it be awarded all reasonable attorney's fees incurred in prosecuting its causes of action through trial and any appeal pursuant to Sections 541.152 and 542.060 of the Texas Insurance Code.

**VIII.**
**PRE-AND-POST JUDGMENT INTEREST SOUGHT**

73.     Plaintiff further seeks the recovery of all interest allowed at law, including pre-judgment and post-judgment interest.

**XI.**
**JURY DEMAND**

74.      Plaintiff hereby requests a jury trial and tenders the appropriate jury fee.

**PRAYER**

In summary, Defendant failed to comply with the Texas Insurance Code and Texas Law in handling the Claim, and has failed to pay all amounts due and owing under the Policy for the Claim.  Defendant failed to perform a thorough investigation of Plaintiff's Claim, failed to employ appropriate or qualified consultants to evaluate the damages, delayed resolution of the Claim under Texas law, and misrepresented applicable scopes of damages as well as the terms of the Policy. Because of these violations of law and wrongful conduct, Plaintiff sustained and continues to sustain significant damages, including but not limited to property damage, diminution of property value, attorneys' fees, financial harm, and other consequential damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that upon trial hereof, Plaintiff has and recovers such sums as would reasonably and justly compensate Plaintiff in accordance with the rules of law and procedure, both as to actual damages, statutory penalties and interest, treble damages under the Texas Insurance Code and all punitive and exemplary damages as may be found.  In addition, Plaintiff requests the award of attorney's fees for the

trial and any appeal of this case, for all costs of Court on their behalf expended, for pre-judgment and post- judgment interest as allowed by law, and for any other and further relief, either at law or in equity, to which Plaintiff may show himself to be justly entitled.

Respectfully submitted,

LUNDQUIST LAW FIRM

By:     */s/   William W. Lundquist*
        WILLIAM W. LUNDQUIST
        Texas Bar No.: 24041369
        Will@LundquistLawFirm.com
        675 Bering Dr., Ste. 850
        Houston, Texas 77057
        Telephone: (346) 704-5295
        Fax: (713) 583-5586

ATTORNEY-IN-CHARGE FOR PLAINTIFF